

Shirley V. Remmert
And Eva Al-Zaghari,
Pro Se Plaintiffs
1000 Twin Dolphin Drive #306
Redwood City, CA 94065
Tel. (510) 610-0962
Email: shirleyremmert4@gmail.com

FILED

JAN 11 2023

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK



## UNITED STATES DISTRICT COURT
### Northern District of California

Shirley V. Remmert
And Eva Al-Zaghari
  **Pro Se Plaintiffs,**



                v.



State of California;
San Mateo County et al.,,
  **Defendants**
_____/

**Complaint and Request for
Injunction - No. 1;
Exhibit A**


CASE NO. *1:23-CV-00050-ADA-HBK*


*Related Current Probate Case:*
*PRO 108876 LPS*
*In the Matter of the Conservatorship*
*Of the Person and Estate of*
*Eva Al-Zaghari, established 2005*

**List of Defendants**

State of California
    Governor Gavin Newsom;
    Superior Court, Probate Division,
    Judge John L. Grandsaert;
San Mateo County
    Public Guardian's Office
    Board of Supervisors,
Under Contract with San Mateo County:
    Davis Guest Home in Stanislaus County;
    Lonny Davis, Owner,
    Psychiatrist Rex Adamson, M.D.
    DOE Nurse, et al.

## Complaint and Request for Injunction

## I.    The Parties to the Complaint

The Pro Se Plaintiffs are Shirley V. Remmert and Eva Al-Zaghari. Ms. Remmert, Ms. Al-Zaghari's mother, lives at the address listed on page 1, which is the contact information for both Plaintiffs. Eva is conserved and is assigned to live at Davis Guest Home, 1878 E. Hatch Road, Ceres, CA 95351. Ms. Remmert is seventy-five years old; Ms. Al-Zaghari is forty-eight.

The Defendants are the State of California Governor Gavin Newsom, Judge John L. Grandsaert of the Superior Court, Probate Division; the San Mateo County Public Guardian's Office and Board of Supervisors; Davis Guest Home, Contractee of San Mateo County; Owner Lonny Davis; Employees Psychiatrist Rex Adamson, M.D; DOE Nurse, et al.

The State of California is a corporate entity and part of the United States.. San Mateo County is incorporated as an agency of the State of California

## II.    Basis for Jurisdiction

### A.    Federal question

#### Violation of the RICO Act

18 USC section 1961 et seq.

#### Civil Rights Violation under Color of Law
42 USC section 1983

#### Violation of ADA

Americans with Disabilities Act of 1990

#### Violation of False Claims Act

Complaint and Request for Injunction- No. 1

### III. Statement of Claim

1.     Plaintiff Eva Al-Zaghari has been falsely imprisoned and tortured by drugs in a State of California conservatorship by a Judgment of 2005, ordering treatment. She has been in a lock-up of the conservatorship and forcibly drugged for the past seventeen years without cause. The Defendants show no intention of releasing her. She is held as a hostage by the Public Guardian's agent, Davis Guest Home, giving her better, non-lethal treatment, only if Eva and her mother, Plaintiff Shirley Remmert, do not litigate against the conservatorship Judgment and order for Treatment (Probate Case: PRO 108876 LPS, *In the Matter of the Conservatorship of the Person and Estate of Eva Al-Zaghari,* established June 13, 2005 by Letters of Conservatorship in the Superior Court for San Mateo County, Hon. John L. Grandsaert).

Even if Ms. Al-Zaghari was lawfully conserved, the Defendants have violated Welfare and Institutions Code section 5361, which states that the conservatorship is terminated after one year.

### Argument

Plaintiffs request that the San Mateo County Public Guardian's Office produce evidence from incidents 1974 through 1995, used to keep Eva Al-Zaghari locked up in the conservatorship as a psychotic under Mental Health laws for the past seventeen years.

2.     Plaintiffs demand to know from the San Mateo County Public Guardian's records what information from incidents 1974 through 1995, was used to conserve Eva Al-Zaghari in 2005. The burden of proof is on the San Mateo County Public Guardian to justify the lock-up and daily drugging of a non-criminal American. Eva has only one misdemeanor on her record during her entire life. She has never abused substances. I was disappointed in the police and hospital response to Eva's injuries after a home invasion in May, 1990. But Eva continued to work very hard as a student and for her family's small business. She owned land as an investment in 1993 and had the opportunity to travel throughout Europe, to Persian Gulf countries, and Cuba in 1998.

She was ready to be a mother for her son, born in 1999, and persevered in court for her maternal rights against Palestinian in-laws under the protection of the court from the Plaintiffs' suits. She was never physically ill from diabetes or other illness when she was detained. She was never a dependent when detained by numerous law enforcement officers from 1997 to 2010 and never exhibited to them that she was a danger to herself and to others. Since 2004, a few law enforcement officers and psychiatrists intentionally induced post-trauma (PTSD) to remind her of the home invasion. She did not react with violence. The assailants in the home invasion of 1990 started the movement against Eva to have her fraudulently conserved.

### Allegations Underlying the Claim

**1976**

When Eva was two years old, Shirley Remmert's mother (Eva's grandmother) was fraudulently diagnosed with schizophrenia by Psychiatrist John Visher, M.D. to cover up the torture she suffered from activists destroying her ability to work in a mission with top secret security clearance during the Vietnam War.

**1988-89**

3.    The Plaintiffs, Filipino-Americans, are known in their cases as members of the Venoya-Remmert-King family.

4.    Influential persons in the County, such as Attorney Dean Lloyd, were upset that Ms. Remmert's mother, Julia Venoya, was not going to sell her property.

5.    Psychiatrist Bruce Bienenstock, M.D. wrote a defamatory letter about Ms. Venoya's capacity that was filed in the Family Court. The letter was used to falsely conserve Ms. Venoya in 2004.

6.    Students, Hilary Adler and Lena Sach, in Eva's sophomore's class at Palo Alto High School taunted or stalked her for no reason. Eva had never interacted with them.

7.    Another bad omen, Shirley Remmert's cousin, Attorney Linda Blackwell, appeared unannounced at her parents' family home in Menlo Park. No one in the family knew her, while she proclaimed that she would take over the management of the property owned by Delfin and Julia Venoya and managed by their daughter, Ms.

Remmert. Ms. Venoya was outraged at the stranger's insinuation that the V-R-K family was incompetent and told her to leave.

**May, 1990**

8.      A home invasion took place at an apartment building owned by Ms. Remmert's parents at 15 Coleman Place, Menlo Park, CA 94025 between midnight and 4 a.m. During the course of the home invasion, in which the only victim, Ms. Remmert's fifteen-year-old daughter, then Eva Remmert, was drugged while sleeping, a male voice told Eva, "Jews set it up." Gang-rape, medical stunts, and LGBT sexual assaults were some of the incidents that the assailants filmed. Eva could only see bright, glaring lights, shadowy figures, and the outlined images of camera equipment.

9.      The Plaintiffs made a complaint to the Menlo Park Police Detective Terri Molakides, a presumed LGBT member,, but Ms. Remmert later learned that she hid the report. The detective told Ms. Remmert to have her daughter get a rape test, but the staff at Stanford Hospital Emergency ignored the mother and daughter, while they waited for treatment from morning until dark with Eva's younger sister, then eight years old.

10.      Other persons who have information about the home invasion are as follows: Ms. Remmert's cousin, Sidney Carter of San Francisco, disclosed by his expression of shock and shame that he saw the videotape of the home invasion.

11.      Eva's former classmate at Nativity School, surnamed Beltramo, pretended that he was not aware of Eva at Menlo Park's Safeway and mimicked what must have been Eva's zombie expression after she was drugged in the home invasion.

12.      John Palacios, a student at Foothill College, without explanation gave Eva a photo of a teen woman with a contorted face from pain. Eva said that it was probably her in the home invasion.

13.      Around 2012, the Armbrusts, a prominent family at Nativity, waylaid Ms. Remmert so that she could see Ms. Armbrust making ugly faces at her from a distance for about a half minute. Eva used to visit them and their daughter.

**June, 1990**

14.      Two weeks after the home invasion, Eva was kidnapped from Ms. Remmert's maternal custody by a female psychologist, who sent Eva to McAuley's Psychiatric

Institute for Children in San Francisco. No police or social worker was involved in the incident. Psychiatrist J. Kevin Rist, M.D., a Jew and member of the LGBT group, gave Eva a defamatory diagnosis of schizophrenia. Ms. Remmert later discovered that the psychiatrist had a high-risk lifestyle, as he died in 2005 from methamphetamine and heroin addiction.

15.     Psychiatrist Alan Brauer, M.D., also a Jew and profiled as a LGBT member, took over Rist's scam in June, 1990 and referred the matter to San Mateo County social workers.  met with two female social workers from the San Mateo County office. They made brief small talk and left.

16.     According to a credible witness in 2010, the June, 1990 reports of Psychiatrist Brauer and social workers were kept in the Menlo Park Police records.

17.     Other persons who have information about the home invasion are as follows:

18.     Ms. Remmert's cousin, Sidney Carter of San Francisco, disclosed by his expression of shock and shame that he saw the videotape of the home invasion.

19.     Eva's former classmate at Nativity School, surnamed Beltramo, pretended that he was not aware of Eva at Safeway and mimicked what must have been Eva's zombie expression after she was drugged in the home invasion.

20.     John Palacios, a student at Foothill College, without explanation gave Eva a photo of a teen woman with a contorted face from pain. Eva said that it was probably her in the home invasion.

21.     Around 2012, the Armbrusts, a leading family at Nativity, waylaid Ms. Remmert so that she could see Ms. Armbrust making ugly faces at her from a distance for about a half minute. Eva used to visit them and their daughter.

**July, 1990**

22.     Several months later, Eva received a high score on her SAT tests and entered Foothill College in Los Altos Hills at the age of sixteen. She quit after one year because of undiagnosed diabetes.

**September, 1990**

23.     Ms. Remmert's cousin, Attorney Linda Blackwell, who is profiled as a LGBT person, took steps to continue the takeover of the V-R-K family of their properties by befriending Julia Venoya's sister, Patricia King, during the time when the Remmerts and

Ms. Venoya were being assaulted by home invasions in their respective homes. Ms. Blackwell set up Patricia King's living trust that would eventually direct the property of Ms. King to L. Blackwell's family instead of Julia Venoya's family.

**March, 1991**

24.     Eva's application to MENSA was approved.

**1992**

25.     Bishop David Bennion, a Jewish convert in the Mormon Church of Menlo Park, appeared to be aware of the film in the home invasion. His openly lustful attitude toward Eva indicated that he had seen the filmed rape of Eva by an older man, the same age as Bennion. He gave the Plaintiffs a  message that if they obeyed, they would be blessed. His wife was equally chilling in her sermon that a young woman would be abducted from her mother and forced to live with a man in the underworld.  The Plaintiffs left the church and a pastor named Gensberg, also a Jew, in the Los Altos Hills Baptist church announced to other pastors at a conference that "Ms. Remmert has a checkered past."

**1995**

26.     Menlo Park Police Officer Gautier detained Eva and sent her to the County psychiatric ward without good cause. She was an adult and not breaking any law.

**November 8, 1995**

27.     The Disability Determination Division of the State Social Services Department determined that Eva was not gravely disabled.


**Today**


28.     The conservatorship case records have been sealed from the accused Plaintiffs since 1990 or earlier.

29.     Ms. Remmert claims that the San Mateo County District Attorney's Office was biased for Ms. Blackwell regarding Ms. Remmert's  2017 felony conviction based on Patricia King's  quitclaim of her house to Ms. Remmert. The court gave the house to Ms. Blackwell and her allies.

30.    The Public Guardian's Office has never met with Eva and her mother for a bona fide meet-and-confer discussion of the basis for the conservatorship.

## IV.    Irreparable Injury

31.    **Exhibit A** of Davis Guest Home's abuses is attached. The alleged wrongs continue: On December 7, 2022, Eva's eyes were bulging out from a drug that she was forced to take. Around December 30, 2022, the staff told her that they would no longer store the snacks that her mother was sending her. Eva obliged. A week later, around January 6, 2023, a nurse told Eva that her mother had to stop sending snacks altogether. These mental health experts are aware of how the continuing small disappointments can set off a person who has been facing four walls in a drugged state for seventeen years during the prime of her womanhood. Her eyes are being ruined, so that she cannot read her books and the discovery I send her. She cannot stay awake to testify in court because of the drugs. The facility seeks more ways to erode her health. The drugs are damaging her bladder and create a host of problems.

32.    For the above reasons, the Court should grant the Plaintiffs their requested relief.

33.    The lock up and forced drugging of Ms. Al-Zaghari is causing her increasing distress after seventeen years of unjustified punishment. These conditions cause Ms. Remmert, her mother, sadness and torment, knowing that her daughter has faced torture, mockery, and inadequate nutrition in her confinement. County officers and workers have persecuted and injured Ms. Remmert since 1990.

34.    Monetary damages at a later time would not adequately compensate the Plaintiffs for the injuries they have sustained and are presently sustaining. Ms. Al-Zaghari is forty-eight years old, a time when the custodians swiftly prepare the confined middle-aged person to a program for the elderly: a more restricted confinement, more drugs, and calcium pills instead of the right to drink milk. Eva is becoming ill because of this new regimen.

Complaint and Request for Injunction- No. 1

35.    In addition, Davis Guest Home has exhibited a pattern of extraordinary abuse against the mother and daughter by using the treatment of drugs as a sword of Damocles over their heads, because the Plaintiffs against their orders, litigate for the end of the conservatorship. The Plaintiffs live in a state of anxiety because of the custodians' weapon of drugs. The Plaintiffs do not know what drug or concoction of drugs forced on Eva will ultimately kill her. No amount of money can measure the harm from the torture from drugs, false imprisonment, hostage-detention, from the conditions of an abusive environment, as well as the harm from the denied right to go to court.

The County has made Ms. Remmert a significant part of the hostage situation requiring her to respond to the torture or abusive treatment meted out to her daughter and to the mother's sustained injuries from County workers' attacks (Case No. 4: 21 cv-02038 KAW).

## V.    Relief

36.    The Plaintiffs request 1) that the Public Guardian release to them a copy of all medical and non-medical information from the Plaintiffs' file from 1990 to 1995. 2) a statement of what information from that period proves the County's right to lock up and forcibly drug a non-criminal in this case. Ms. Remmert is entitled to the information, since Eva was a minor under Ms. Remmert's maternal custody in 1974 ~ 1993.

37.    The Plaintiffs request Eva Al-Zaghari's release from the conservatorship. They intend to live together. In the alternative, they request a preliminary injunction of the conservatorship.

38.    If Eva is not released and the preliminary injunction denied, the Plaintiffs request that Eva reside in San Mateo County, her legal county of residence, either with Ms. Remmert in her apartment in the County-owned building offering in-house mental health services, or she may live in a suitable board and care. In Davis Guest Home, she is far from her court records, with no access to her family and attorneys.

39.    If the court requires her to remain in Davis Guest Home, the Plaintiffs see no harm in Eva receiving low-calorie snacks two times a week from her mother at this time.

40.    I, Plaintiff Shirley V. Remmert, declare that the above statements are true and correct under the penalty for perjury of the State of California laws.

*Shirley V. Remmert*                                    *January 9, 2023*

Shirley V. Remmert                                        Date

The Declaration of Eva Al-Zaghari as to the truth of the above statements follows.

CASE NO.

I, Plaintiff Eva Al-Zaghari, have read the above document. Plaintiff Shirley Remmert, my mother, informed me of the discovery she provided and of the contents of any exhibits submitted. I have the capacity to understand the complaint, but must rest frequently due to the court-ordered drugging and the drugs' side effects. I declare that the statements in the document are true and correct, according to my information, my memory of incidents, and belief, under the penalty for perjury of the federal laws.

Respectfully submitted,

_Eva Al-Zaghari_
Eva Al-Zaghari

_11-18-22_
Date

Plaintiff Eva A.'s Signature

1

Shirley V. Remmert
And Eva Al-Zaghari,
Pro Se Plaintiffs
1000 Twin Dolphin Drive #306
Redwood City, CA 94065
Tel. (510) 610-0962
Email: shirleyremmert4@gmail.com

## UNITED STATES DISTRICT COURT
### Eastern District of California

Shirley V. Remmert;
Eva Al-Zaghari,
   **Plaintiffs**

Plaintiffs' Exhibit  A

for " Complaint and
Request for Injunction"

CASE NO.

Hon.

*Related Current Probate Case:*
*PRO 108876 LPS*
*Superior Court, San Mateo County,*
*In the Matter of the Conservatorship*
*Of the Person and Estate of*
*Eva Al-Zaghari, estab'd 2005*

V.

State of California;
San Mateo County,
Et al.,
   **Defendants**
_____/

1

I, Eva Al-Zaghari, declare as follows:

1.      If the detention of March 26, 2005 was for personal reasons (*See Sheriff Deputy's Detention*) and there was no due process, the Judgment of June 10, 2005 is without basis. The wording for the Judgment, including the order for treatment, was drafted by Deputy County Counsel Judith Holiber.

2.      Pursuant to the conservatorship Judgment (Exhibit A), Davis Guest Home has carte blanche to give treatment that will offset or cure the grave disability. I did not have any disability when Sheriff O'Donnell detained me for the targeted conservatorship. The Menlo Park firemen came with advanced life support and found no need to give aid. I was not a dependent. No one claimed me as a dependent, because no one had a legal obligation to care for me.

3.      The conservatorship with its order for forced drugging and medication has eroded my health. Each time, I am injected with the unwarranted drug, or forced to take the drug, I experience post-trauma dating back to the 1990 home invasion, when assailants drugged me while I slept.

4.      All of the psychiatrists, who have treated me in the conservatorship, and persons in their outer circle, want to destroy my mind, but not get caught doing it. The Judgment is an execution in slow motion.

**2007**

5.      I began living in Davis Guest Home (DGH). My conservator, Supervising Deputy Marcelle Moon, told the court that she wanted me far away from my mother. Moon wanted to retaliate for statements my mother made about the unsafe County halfway house that Moon wanted me to stay in. I escaped on my own from the house. When I was captured, Moon forced me to take a vicious drug that caused violent headaches. The DGH staff placed me in a hospital but did not tell me the purpose of the stay.

6.      I was disturbed by the fact that none of DGH's clients stayed for long periods. The conservatorship lasts only one year for most people. The regimen of drugs day in and day out seems to be more suitably applied to violent, psychotic patients at Napa than to someone in a Guest Home.

7.    Whenever the court allowed my mother to visit me, Davis Guest Home, Deputy Public Guardian Moon, and other County officers maneuvered her into a restraining order prohibiting contact with me for three years at a time.

October 16, 2008

8.    At my petition for the termination of the conservatorship, I received the Jury's Verdict, which stated: "The conservatee is not gravely disabled under the LPS Act."

Winter, 2008

9.    My father, Brent Remmert, tried to visit me and left word with Deputy County Counsel Peter Finck, who refused the visit. My father worked in South Korea and could not visit often. He later came down with the flu, recovered, and returned to his work overseas.

January, 2009

10.    A DGH staff worker told me I could leave because of the Jury's Verdict. I left and stayed with my mother and my grand-aunt in East Palo Alto, but we did not know that the staff worker tricked me into a plan for another detention and a fake trial to conserve me all over again.

February 9, 2009

11.    I was detained in front of our family home in Menlo Park and forced to live again in Davis Guest Home.

12.    I do not remember the exact date, but immediately after my mother was able to visit me, I was given a psychotropic drug in time for her visit. She could not stay long because I was convulsive and she was in the way of treatment.

March 25, 2009

13.    At the new conservatorship trial, Judge Marie Weiner's order stated that I could be assigned to a State Hospital at the option of Conservator Moon.

@2010

14.    On Martin Luther King Day, my father tried to visit me at Davis Guest Home. He was ill for longer periods of time. My mother was subject to a restraining order at that time. She told me that he demanded that she drop him off at the door. My mother explained that because of the restraining order, she could drop him off at the street adjoining the entrance to the long driveway. An argument brewing, she relented and

3

PRO 108876 LPS.Conservatee's Declaration that Drugging is illegal and harmful

drove him up to the door. I rushed outside to greet my father, but was called back. The staff informed my mother that my father would be denied entry because my mother was violating the order by being on the property. I stopped to look at my father before returning inside. That was the last time my father was well enough to make the trip, and my last time to see him.

15.    My mother told me that she tried to explain to the personnel in the administration building about my father's dilemma. She said that several workers stood outside with catcalling remarks, such as "You're not black enough to claim civil rights!"

December 22, 2010

16.    At Davis Guest Home, I was given psychotropic drugs that made me regularly vomit as punishment for my mother's visits with me during the expired restraining order. The staff ignored the incidents. After signing my name in the "Pass" book and writing that I was going to court, my mother helped me leave.

17.    The signing out for a weekend leave was DGH policy. Ceres Police Officer Vierra, telephoned my mother, while we were enroute to my aunt's house. He demanded that my mother return Eva to DGH because they were the conservator, not San Mateo County. My mother objected. He insisted that they had taken over the conservatorship.

September, 2012

18.    At my petition for the termination of the conservatorship, my grand-aunt, Patricia King, went to court on behalf of my mother and me and offered to let me live with her and my mother in her East Palo Alto house. Judge Jonathan Karesh rejected the offer and did not terminate the conservatorship.

@ 2012

19.    When my restraining order expired, Davis Guest Home had changed my relatively tolerable room to one that caught wind of the cigarette smoke allowed near my area. The staff has on record that I am susceptible to asthma.

April, 2014

20.    While the restraining order had expired, Deputy County Counsel Finck demanded, without legal cause, that another restraining order be issued. My mother and I said our good-byes at Davis Guest Home. As we embraced each other, I suddenly

4

saw the desk clerk fixing her eyes on me. She had the same evil expression as the people in the home invasion of May, 1990. My mother was startled by my pulling away from her. She told me that she followed the direction of my eyes focused on the Davis employee and witnessed her hypnotic stare. When my mother saw my fear, she quickly left, so that the staff worker, linked with the May, 1990 home invasion or the filming of the invasion would leave me alone.

21.    DGH gave me only one meal per day in retaliation for my mother's judicial opposition to the County's application for a renewed restraining order.

22.    Deputy County Counsel Peter Finck was granted a three-year restraining order without cause. His restraining order led to another, so that I would not have contact with my mother for almost eight years after 2014.

2016

23.    Judge Lee at my mother's criminal trial, regarding a false charge of abuse of my grand-aunt (Case No. 16-SF-004106A, *People v. Remmert*), honored Psychiatrist Adamson's spurious objection to releasing me to court for my testimony on behalf of my mother.

2017

24.    During an expired period of the 2014 restraining order, I received a letter from my mother telling me that she was in jail.

June 4, 2019

25.    After my mother was released from prison, she tried to contact me. Deputy Public Guardian Vanessa Osuna had confiscated my mother's letters to me since 2017. Osuna never told me. She placed another three-year restraining order on my mother. She showed Judge George Miram three letters from my mother to me. My mother wrote that she hoped Trump would be re-elected and that I would be free.

June 4, 2022

26.    The restraining order of 2019 expired. My mother now regularly contacts me by phone because of the distance and transportation cost.

July 1, 2022

27.    I fell down twice for the first time and needed medical attention. I am forty-eight years old. My son gave me sweets, but I am afraid to eat them. In combination with the drugs, the sugar can have a more toxic effect.

July 4, 2022

28.    I complained to my mother that Psychiatrist Rex Adamson, M.D. gave me drugs that made me throw up. I listed them to her as Quazaril and Latuda, both psychotropic drugs. The incidents happened just before the last restraining order was about to expire on June 4, 2022 and was therefore retaliatory on his part.

29.    I have a constant need to go to the bathroom because of the drugs. I feel drowsy all day, every day.

July 12, 2022

30.    At 1:00 p.m., I was very ill. My mother called the Ceres Police @4:15 p.m. to do a welfare check. The officer named Corone (sp?) would not give her the report number. He said that she could get the report number from the Deputy Public Guardian.

Between July 13 and July 25, 2022 -

31.    My mother told me that she called around four times at different times, but no one answered.

July 25, 2022, 1:00 p.m.

32.    My mother told me that "Ellen" answered her phone call. She said that I was being quarantined and that I have scabies. I was very itchy. My roommate said she was itchy, but she did not seem to be.

33.    I was upset that I had to stay in isolation in my room for eight days, never knowing when the abuse would end. I did not know if I was the only one who was itchy; whether the cause was from the numerous unknown pills I am forced to take. Everyone had to stay in each of their rooms. I could see the food brought into each of our rooms.

July 26, 2022, 1:00 p.m.

34.    My mother told me that when she called today, the person answering said nothing and hung up on her.

35.    Deputy County Counsel emailed my mother to tell her that it was a scabies outbreak. (Exhibit A)

July 27, 2022, 10:50 a.m.

6

36.    "Hollis" answered and said, "She [Eva] doesn't want to come to the phone."
July 28, 2022, 9:10 a.m.

37.    My mother called the Stanislaus County Health Department, (209) 558-7700. The agent informed her by email that there is no order for a quarantine and that Davis Guest Home does not have a scabies outbreak. The agent wrote that she asked the DGH administrator to call my mother and to give her the same information (Exhibit B).
July 29, 2022, 10:00 a.m.

38.    My mother called me and was immediately put through to me. I was upset that I had to stay in isolation in my room for eight days, never knowing when the abuse would end.

**August 25, 2022**

39.    My mother planned to bring the petition for the termination of the conservatorship for me to sign, but "Gloria" told her that she could not visit because of a lockdown and quarantine, but that she could stand outside. My mother informed the worker that there was no lockdown or quarantine.

Conclusion

40.    Not only is the Judgment for treatment baseless, with no foundation, except a fraudulent detention by Sheriff Deputy O'Donnell et al., the so-called treatment amounts to assault and battery.

_Eva Al-Jaghari_                    9-29-22

Eva Al-Zaghari                       Date

PRO 108876 LPS.Conservatee's Declaration that Drugging is illegal and harmful

**Caiti
Busch**

3:41 PM (1 hour
ago)

**Shirley
Remmert**

3:52 PM (1 hour
ago)

Than
k
you!

4:05 PM (1 hour
ago)

**Caiti Busch**

to me

Vanessa called Davis Guest Home and they said all calls are being transferred to Eva.  They
just lifted their COVID restrictions yesterday and they now dealing with a scabies outbreak, so
it's been hectic over there.  Eva is currently in isolation, so no calls are being transferred to her
currently, but that will change when she is out of isolation.

You also tend to call at 1:00pm, which is right after lunch and usually when their in house
activities or outings are scheduled.  Once the isolation period is over, you should try calling Eva
early morning later in the afternoon.  If you continue to be unable to connect with her, let me
know and we can schedule a call for you.

5:16 PM (0
minutes ago)

**Shirley Remmert**

to Caiti

Thank you. Please have Deputy Osuna monitor this, so you can tell me when the isolation
period is over.

o
m
e
t
o
c

2
:
2
2
P
M
(
4
h
o
u
r
s
a
g
o
)

7·28· 2022

P
a
y
e
n
g
M
o
u
a
v
P
M
o
u
a
@
s
c
h
s
a
,

O
r
g
>

t
o
m
e,
E
k
at
er
in
a,
H
S
A

Hi Shirley,

I spoke with Heather and she confirmed they do not have a scabies outbreak.
I asked her to give you a call to clarify things.

Sincerely,

Payeng Moua, RN

*Stanislaus County Health Services Agency*

*Communicable Disease Prevention Section*

Desk: 209-558-8003

Fax: 209-558-7531

E-mail: *PMoua@schsa.org*

http://www.schsa.org/



ReplyReply
allForward